UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____3/27/17____
```

----------------------------------------------------------X

THE NATIONAL RETIREMENT FUND and
THE BOARD OF TRUSTEES OF THE
NATIONAL RETIREMENT FUND, each on
behalf of the Legacy Plan of the National
Retirement Fund,

                                Plaintiffs,

                -against-

METZ CULINARY MANAGEMENT, INC.,

                                Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

16-CV-2408 (VEC)

MEMORANDUM
OPINION & ORDER

----------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

       Plaintiffs, the National Retirement Fund and the Board of Trustees of the National

Retirement Fund (the "Trustees," and together with the National Retirement Fund, the "Fund"),

each on behalf of the Legacy Plan of the National Retirement Fund ("the "Plan"), bring this

action against the Defendant, Metz Culinary Management, Inc. ("Metz"), pursuant to Sections

4221(b)(2) and 4301 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended, 29 U.S.C. §§ 1401(b)(2), 1451, to modify or vacate the arbitration award issued by

Arbitrator Ira F. Jaffe in *Metz Culinary Management, Inc. and National Retirement Fund*,

American Arbitration Association ("AAA") Case No. 01-14-0002-2075 (the "Arbitration") on

March 28, 2016 (the "Final Award").  Metz has cross moved to confirm the Final Award.  For

the following reasons, the Fund's motion to vacate the Final Award is GRANTED, and Metz's

motion to confirm the Final Award is DENIED.

BACKGROUND[1]

## I.    Statutory Background Regarding Withdrawal Liability

Among its several goals, ERISA "was designed to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986) (quotation marks and citation omitted). "One type of pension plan regulated by ERISA is the multiemployer pension plan, in which multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." *Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 129 (2d Cir. 2012). Although multiemployer plans have many benefits, such as allowing employers to share the costs and risks inherent in the administration of pension plans, *id.*,

> [a] key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Id.* (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n. 2 (1984)).

In order to address this problem, Congress amended ERISA by enacting the Multiemployer Pension Plan Amendments Act of 1980 ("the MPPAA), Pub. L. No. 96–364, 94

---

[1]      The Court cites to the parties' briefs as the following: the Fund's Memorandum of Law in Support of Motion to Vacate Or Modify the Arbitration Award (Dkt. 19) is "Pls. Mem.;" Metz's Memorandum of Law in Opposition to Plaintiffs' Motion to Vacate or Modify Arbitration Award And in Support of its Motion to Enforce Arbitration Award (Dkt. 33) is "Def. Opp.;" the Fund's Opposition to Defendant's Motion for Judgment on the Pleadings And Reply in Support of Plaintiffs' Motion to Vacate or Modify Arbitration Award (Dkt. 36) is "Pls. Reply;" and Metz's Reply Memorandum of Law in Further Support of its Motion to Enforce Arbitration Award (Dkt. 40) is "Def. Reply."

Stat. 1208 (codified as amended in scattered sections of Titles 26 and 29 of the United States

Code). *Id.* Pursuant to the MPPAA, "[i]f an employer withdraws from a multiemployer plan . . .

the employer is liable to the plan in the amount determined under this part to be the withdrawal

liability." 29 U.S.C. § 1381(a). "Withdrawal liability is the withdrawing employer's

proportionate share of the pension plan's unfunded vested benefits." *Trs. of Local 138 Pension

Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d at 130; *see also* 29 U.S.C. §§ 1381, 1391.

Unfunded vested benefits are "calculated as the difference between the present value of vested

benefits and the current value of the plan's assets." *Pension Benefit Guar. Corp. v. R.A. Gray &

Co.*, 467 U.S. at 725 (citing 29 U.S.C. §§ 1381, 1391). In other words, unfunded vested benefits

reflect a plan's underfunding in light of its commitment to pay benefits to plan participants in the

future. The calculation of an employer's withdrawal liability thus requires the allocation of a

plan's unfunded vested benefits among the plan's contributing employers. *Combs v. Classic

Coal Corp.*, 931 F.2d 96, 98 (D.C. Cir. 1991). Section 4211 of ERISA allows a plan to choose

one of four identified allocation methods or to develop its own method, subject to approval by

the Pension Benefit Guaranty Corporation ("PBGC"). 29 U.S.C. § 1391. Withdrawal liability is

required to be calculated "not as of the day of withdrawal, but as of the last day of the plan year

preceding the year during which the employer withdrew." *Milwaukee Brewery Workers'

Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 418 (1995) (citing 29 U.S.C.

§§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A), and (c)(4)(A)). The "last day of the

plan year preceding the year during which the employer withdrew" will hereafter be referred to

as "the Measurement Date."

   In order to determine a withdrawing employer's withdrawal liability, the plan's actuary

must first calculate the plan's unfunded vested benefits; to do so, the actuary must estimate the

present value of the plan's vested benefits. *Combs v. Classic Coal Corp.*, 931 F.2d at 98. The

actuary makes certain assumptions in order to estimate the present value of the plan's vested

benefits, including the  interest rate necessary to discount the liability for future benefit

payments.  *Id*; *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 733 (4th Cir.

1990) (explaining that to "calculate the present value of the vested benefits that are to be paid out

in the future," "[a]n interest rate, or rate of return, is applied in order to determine what present

amount of investment will yield the future amounts required to satisfy those vested benefits"); *In

re HNRC Dissolution Co.*, 396 B.R. 461, 473 (B.A.P. 6th Cir. 2008) ("The calculation of the

'present value' of vested benefits also requires the plan's actuary to discount the future stream of

benefit payments at an appropriate interest.").  Although there are many actuarial assumptions

necessary to calculate withdrawal liability, only the interest rate assumption is at issue in this

case.  Relevant to this case, "[i]ncreasing the interest rate assumption decreases the employer's

withdrawal liability"—and vice versa.  *Combs v. Classic Coal Corp.*, 931 F.2d at 98; *see also

Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d at 733.  ERISA does not dictate

the interest rate.  Instead, ERISA Section 4213(a) requires withdrawal liability to be based on

"reasonable" actuarial assumptions and methods, "taking into account the experience of the plan

and reasonable expectations," and to be "the actuary's best estimate of anticipated experience

under the plan."  29 U.S.C. § 1393(a).[2]

## II.      Factual Background

### A.  The Parties

The Fund is a Taft-Harley trust fund, established and maintained pursuant to Section

302(c)(5) of the Labor Management Relations Act, 29 U.S.C. § 186(c)(5), with trustees equally

---

[2]        Section 4213(a)(1) contemplated that PBGC may prescribe actuarial assumptions by regulation, but it has
not done so to date.  Pls. Mem. 9 n.8.

divided between labor organizations currently and formerly affiliated with UNITED HERE and

Workers United and employers that contribute to the Fund.  Am. Compl. ¶ 4 (Dkt. 8).  The Plan

is a multiemployer plan within the meaning of Section 3(37) of ERISA, 29 U.S.C. § 1002(37).

*Id.* ¶ 6.[3]  Metz participated in the Fund as a contributing employer, meaning it made

contributions to the Fund to provide pensions to its employees in accordance with the governing

collective bargaining agreements.  Answer to Am Compl. Ex. B ("Stip.") ¶ 2 (Dkt. 16-1).[4]

**B. The Fund's Selection of an Interest Rate Assumption for Withdrawal
Liability for Plan Years 2013 and 2014**

The Fund's plan year begins on January 1 and ends on December 31 (the "Plan Year").

Am. Compl. ¶ 12.  Accordingly, under the Plan, the Measurement Date for withdrawal liability

for a given year is December 31 of the prior year.  As of December 31, 2012, Buck Consultants

("Buck") was, and had been for years, the Fund's actuary.  *Id.* ¶¶ 14-15; Stip. ¶ 7.  Buck's

interest rate assumption for the 2013 Plan Year for calculating withdrawal liability was 7.25%.

Am. Compl. ¶ 15.  Thus, the withdrawal liability for any employer that withdrew from the Plan

during 2013 would be calculated using a discount rate of 7.25%.

In October 2013, the Fund selected Horizon Actuarial Services LLC ("Horizon") to

replace Buck as the Fund's actuary.  *Id.* ¶ 13.  On June 5, 2014, Horizon informed the Fund's

trustees that Horizon would use a PBGC rate as its interest rate assumption when it calculated

withdrawal liability for Plan participants that withdrew on or after January 1, 2014.  *Id.* ¶ 18.  On

---

[3]     As of January 1, 2013, the Plan had over 412,000 active, terminated, and retired participants.  Sabatini
Decl. Ex. A, at 6 (ECF pagination) (Dkt. 20-1).  Prior to January 1, 2015, the Plan was known as the Pension Plan of
the National Retirement Fund.  Am. Compl. ¶ 7.  The Fund, through its trustees, sponsors and administers the Plan.
*Id.* ¶ 5.  The trustees are fiduciaries of the Fund and the Plan within the meaning of Section 3(21)(A) of ERISA, 29
U.S.C. § 1002(21)(A).  *Id.* ¶ 9.

[4]     Metz is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. § 1002(5); it is engaged in
commerce, and its activities affect commerce within the meaning of Sections 3(11)-(12) of ERISA, 29 U.S.C.
§§ 1002(11)-(12).  Am. Compl. ¶ 11.

5

October 3, 2014, Horizon sent a memorandum to the Fund's trustees explaining its decision to select the PBGC's interest rate assumption and the impact of the change on withdrawal liability. Stip. ¶ 12; Litvin Decl. Ex. F (Dkt. 32-1). The PBGC rate selected by Horizon was 3% as applied to the first twenty years of unfunded vested benefits and 3.31% thereafter. Am. Compl. Ex. B ("Interim Award"), at 4 (Dkt. 8-2); Litvin Decl. Ex. F, at 1. Because the interest rate assumption decreased from Plan Year 2013 to Plan Year 2014, withdrawal liability for withdrawing employers increased from Plan Year 2013 to Plan Year 2014. It is undisputed that the Fund was in dire financial circumstances in the time frame relevant to this case, leading it to freeze the accrual of benefits as of December 31, 2013. Stip. ¶¶ 16-18. The Fund did not provide any advance written notice in Plan Year 2014 to contributing employers regarding the interest rate assumption change. *Id.* ¶ 19.

Although the Fund selected Horizon to replace Buck as its actuary in October 2013, Buck continued to perform some work for the Fund related to Plan Year 2013. Specifically, in November 2013, Buck completed and issued the Actuarial Valuation Report for the 2013 Plan Year. *Id.* ¶¶ 7, 13; Litvin Decl. Ex. G (Dkt. 32-2). On November 6, 2014, Buck completed and issued the Schedule MB for the Fund's Form 5500 for Plan Year 2013. Stip. ¶ 7; Litvin Decl. Ex. H (Dkt. 32-3).[5]

---

[5] The Department of Labor, PBGC, and IRS require plan sponsors to submit Form 5500 to satisfy annual reporting requirements under ERISA and the Internal Revenue Code. Form 5500 Corner, IRS, https://www.irs.gov/retirement-plans/form-5500-corner (last visited March 23, 2017).

The Court may take judicial notice of this public information on the IRS's website pursuant to Federal Rule of Evidence 201. *See Fernandez v. Zoni Language Centers, Inc.*, No. 15-CV-6066 (PKC), 2016 WL 2903274, at *3 (S.D.N.Y. May 18, 2016) ("Courts may also take judicial notice of information contained on websites where 'the authenticity of the site has not been questioned.'" (quoting *Hotel Emps. & Rest. Emps. Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 549 (2d Cir. 2002))); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 167 (S.D.N.Y. 2015) (taking judicial notice of information publicly available on an internet database) (citing cases).

### C.  Metz's Withdrawal from the Plan

Metz withdrew from the Fund on May 16, 2014.  Am. Compl. ¶ 17.  That withdrawal triggered Metz's obligation to pay withdrawal liability, which would be calculated as of December 31, 2013.  Def. Opp. 5.  On June 16, 2014, the Fund sent Metz a notice and demand letter for the payment of withdrawal liability.  Am. Compl. ¶ 19.  In that letter, the Fund assessed Metz an estimated withdrawal liability of $954,821, payable in installments.  *Id.* ¶ 20.  On December 26, 2014, the Fund issued a revised withdrawal liability assessment to Metz for $997,734, payable in installments.  *Id.* ¶ 21.

### D.  The Arbitration

On December 16, 2014, Metz filed a demand for arbitration against the Fund with the AAA in order to challenge the Fund's withdrawal liability assessment.  *Id.* ¶ 22.  The AAA appointed Ira F. Jaffe, Esq. (the "Arbitrator") to serve as arbitrator.  *Id.* ¶ 23.  The Fund and Metz agreed that the Arbitrator would resolve a preliminary issue regarding the interest rate assumption used by the Fund to calculate Metz's withdrawal liability and that he would do so based solely on written stipulations and briefing.  Interim Award 1-2.  Accordingly, the parties did not conduct discovery except for limited document requests by Metz.  Am. Compl. ¶ 24.

On February 22, 2016, the Arbitrator issued an Interim Award, holding that the Fund improperly used the PBGC rate to calculate Metz's withdrawal liability.  *Id.* ¶ 25; Interim Award 20.  According to the Arbitrator, because there was no evidence that Buck or Horizon took any action on or before the Measurement Date to change the interest rate assumption, the 7.25% interest rate assumption that indisputably had been in effect for Plan Year 2013 continued as the interest rate assumption for Plan Year 2014.  Interim Award 15-16, 19.  The Arbitrator explicitly rejected the Fund's position that the Fund's actuary had made no interest rate assumption as of December 31, 2013.  *Id.* at 16.  In doing so, the Arbitrator concluded that "[a]bsent some change

by the Fund actuaries, the existing assumptions and method remained in place as of December 31, 2013." *Id.*[6]  The Arbitrator then held that Horizon had improperly retroactively changed the withdrawal liability interest rate assumption in violation of ERISA and PBGC opinion letters. *Id.* at 11-16.  The Arbitrator made clear that it would have been permissible for the actuary to have *calculated* unfunded vested benefits after the Measurement Date, but the actuary could only rely on assumptions and methods "that were actually adopted and in effect as of December 31, 2013." *Id.* at 17.  Because, according to the Arbitrator, the 7.25% withdrawal liability interest rate assumption was in effect as of the Measurement Date, the actuary was required to use that rate when calculating  Metz's withdrawal liability.  *Id.* at 15-17, 19.

In his Interim Award, the Arbitrator directed the Fund to recalculate Metz's withdrawal liability "using the assumptions and methods that were in effect as of December 31, 2013." *Id.* 19; Am. Compl. ¶ 26.  On March 7, 2016, the Fund provided Metz an updated withdrawal liability assessment using the 7.25% withdrawal liability interest rate assumption from Plan Year 2013.  Am. Compl. ¶ 27.  The revised withdrawal liability assessment was approximately $250,000, *see* Answer to Am Compl., Ex. A, at 1 (Dkt. 16-1), and Metz did not object to the revised assessment, Am. Compl. ¶ 28.  On March 28, 2016, the Arbitrator issued his Final Award, affirming the revised calculation and converting the Interim Award to a final award.  *Id.* ¶¶ 29-30; *id.* Ex. A.  On March 31, 2016, the Fund initiated this action in order to vacate or modify the Final Award.

---

[6]         *See also* Interim Award 17 ("In the absence of some action by the Fund Actuary changing the interest rate or other actuarial assumptions *prior to the end of a Plan Year*, the interest rate and assumptions that were in effect during that Plan Year continued unchanged.") (emphasis added).

**DISCUSSION**

The principal issue before this Court is whether the Arbitrator correctly decided that the Fund violated ERISA by selecting the interest rate assumption for withdrawal liability for the 2014 Plan Year after the Measurement Date. The Arbitrator reached his conclusion by reframing the issue. The Arbitrator did not ultimately conclude that the Fund violated ERISA because its actuary *selected* a withdrawal liability interest rate assumption for the 2014 Plan Year after the Measurement Date. Instead, the Arbitrator concluded that the Fund violated ERISA because its actuary *retroactively changed* the interest rate assumption for the 2014 Plan Year after the Measurement Date. The Arbitrator's conclusion hinged on his determination that the existing interest rate assumption for the 2013 Plan Year became the interest rate assumption for the 2014 Plan Year because the Fund's actuary did not affirmatively change the interest rate assumption by the Measurement Date.

The Court rejects the Arbitrator's premise as inconsistent with ERISA—the withdrawal liability interest rate assumption for the preceding plan year cannot become the interest rate assumption for the following plan year by inertia. Nor does ERISA prohibit a plan's actuary from selecting the withdrawal liability interest rate assumption after the Measurement Date. Accordingly, as explained more fully below, the Arbitrator's Final Award is vacated.

I.      **The Court Reviews the Arbitration Award *De Novo***

The parties dispute whether a *de novo* standard of review or a rebuttable presumption of correctness applies to resolve their cross motions to confirm and vacate the Final Award. In a dispute regarding withdrawal liability under ERISA, courts review *de novo* the legal conclusions of the arbitrator. *666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*, 571 F. App'x 51, 52 (2d Cir. 2014) (per curiam); *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 160 (2d Cir. 2012). As to the review of factual findings, ERISA, as amended by the

9

MPPAA, provides that "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."  29 U.S.C. § 1401(c). The statutory framework does not expressly mandate a standard of review for mixed questions of law and fact.  *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1410 (7th Cir. 1989).  The Second Circuit has not resolved the issue, but courts faced with the issue appear to adopt a clear error standard of review.  *See 666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund*, No. 12 CIV. 1251 (PAE), 2013 WL 4042614, at *5 (S.D.N.Y. Aug. 8, 2013) (collecting cases), *aff'd,* 571 F. App'x 51 (2d Cir. 2014).

Metz argues that the Arbitrator's determination that the withdrawal liability interest rate assumption for Plan Year 2013 carried over as the interest rate assumption for Plan Year 2014 was a factual finding based on the parties' joint stipulation of facts.[7]  Def. Opp. 11-15.  The Fund argues that the Arbitrator made a legal determination when it decided that the existing assumptions continued from one plan year to the next absent a change by the actuary.  Pls. Mem. 8.  The Court agrees with the Fund; the Arbitrator made a legal determination, not a factual finding.

Whether the Fund's actuary affirmatively adopted a withdrawal liability interest rate assumption by the Measurement Date for the 2014 Plan Year is a factual question.  The parties do not dispute that factual issue—they (and the Arbitrator) agree that the actuary did not affirmatively adopt a withdrawal liability interest rate assumption by December 31, 2013 for the

---

[7]        Metz argues in the alternative that whether the 2013 Plan Year withdrawal liability interest rate assumption continued as the assumptive rate for the 2014 Plan Year is a mixed question of law and fact.  Def. Opp. 13 n.8.

2014 Plan Year.[8]  Rather, they dispute whether, because the actuary did not affirmatively make assumptions on or before the Measurement Date for the 2014 Plan Year, the assumptions that were in place for the 2013 Plan Year became the actuarial assumptions for the 2014 Plan Year by default.  Resolving this dispute requires a legal determination under ERISA; the answer to this question turns on the language of the statute.  Specifically, whether withdrawal liability assumptions automatically carry over year-to-year in the absence of an actuary's affirmative adoption of different assumptions depends on what ERISA requires of actuaries when they select assumptions for withdrawal liability calculations for a given plan year.

The Arbitrator himself framed as a legal conclusion his determination that the 2013 Plan Year interest rate assumption carried over to the 2014 Plan Year.  He based his conclusion on an interpretation of ERISA, as amended by the MPPAA.  According to the Arbitrator, because the "MPPAA requires that the assumptions and methods in effect on December 31, 2013, be used for calculating the Employer's withdrawal liability,"  "[a]bsent some change by the Fund actuaries, the existing assumptions and method remained in place as of December 31, 2013."  Interim Award 16.  Even Metz stated in its opening and reply briefs submitted to the Arbitrator that the issue before the Arbitrator was purely legal.  Sabatini Decl. Ex. B, at 2 (Dkt. 37-4) ("The issue presented is a legal question of statutory interpretation. . . . [T]his preliminary issue does not present any questions of fact or even mixed questions of fact and law . . . ."); id. Ex. C, at 1 (Dkt. 37-5) ("The legal issue presented is a dispositive legal issue in this arbitration proceeding. . . . This briefing is in the nature of a motion for summary judgment, under Rule 56 of the F.R.C.P., based on the material facts to which the parties have stipulated.").  Moreover, because

---

[8]       As discussed below in Section III, Metz appears to argue that certain documents suggest that Buck intended the 7.25%  interest rate assumption for the 2013 Plan Year to apply to the 2014 Plan Year, although Metz does not go so far as to argue that Buck affirmatively adopted the 7.25% interest rate for the 2014 Plan Year.

the parties stipulated to all the facts before the Arbitrator, the Arbitrator's conclusions were exclusively legal.[9] *TCG N.Y., Inc. v. City of White Plains*, 305 F.3d 67, 75 (2d Cir. 2002) ("Because, as we have noted, the parties stipulated to all facts, the district court's conclusions are exclusively conclusions of law that are reviewed *de novo*."); *see also United Gen. Title Ins. Co. v. Karanasos*, No. 13-CV-7153 (JFB), 2014 WL 4388277, at *5 (E.D.N.Y. Sept. 5, 2014) (collecting cases).

Accordingly, only legal conclusions are before the Court, and the Court reviews them *de novo*.[10]

## II. Interest Rate Assumptions Do Not Automatically Carry over Year-to-Year under ERISA

The Arbitrator incorrectly held that under ERISA, when an actuary fails affirmatively to adopt assumptions for a given plan year to calculate withdrawal liability, the existing actuarial assumptions from the preceding plan year remain in place by default.  ERISA Section 4213 precludes this approach.

As explained above, Section 4213 requires that actuaries calculate withdrawal liability based on "assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan . . . ."  29 U.S.C. § 1393(a)(1). Thus, to satisfy Section 4213, actuaries must take into account the full experience of the plan, develop reasonable expectations, and ultimately provide their *best* estimate of unfunded vested

---

[9]      The parties filed some exhibits with the Arbitrator in support of their stipulated facts, but the Arbitrator did not appear to rely on those exhibits in concluding that the 2013 Plan Year interest rate assumption continued by default for the 2014 Plan Year.  He neither cited nor referred to the exhibits in support of his conclusion (although he did refer to them in the background portion of the Interim Award).

[10]     Even if the issue before the Court were a mixed question of law and fact, Metz would ultimately fare no better under a clear error standard of review.

benefits in light of the plan's experience and the actuary's reasonable expectations.  An actuary

can only do so by incorporating data from the entirety of the most recent preceding plan year.  In

no universe is carrying over assumptions from a prior plan year without *any* examination or

analysis as to their continued viability and reasonableness an actuary's "best estimate."  Yet the

Arbitrator concluded precisely that.  An actuary may ultimately conclude that the prior plan

year's assumptions continue to be reasonable in light of all of the available data, but she must

affirmatively reach that conclusion in order for the assumptions to qualify as such.  As addressed

more fully below, there is no evidence here that any actuary analyzed and concluded that the

2013 Plan Year assumptions as applied to the 2014 Plan Year were reasonable or were the

actuary's best estimate, nor did the Arbitrator indicate that he was relying on any such evidence

or making any such assumptions.  A consequence of the Arbitrator's holding would be that

actuarial assumptions would remain operative in perpetuity *sans* input from the actuary; this is

entirely at odds with Section 4213.  Section 4213 does not allow stale assumptions from the

preceding plan year to roll over automatically —unlike wine, actuarial assumptions do not

improve with age.

The Arbitrator's holding was also inconsistent with Section 4211 of ERISA.  The

Arbitrator reasoned that the 2013 Plan Year assumptions rolled over by default for the 2014 Plan

Year because ERISA "requires that the assumptions and methods in effect on December 31,

2013, be used for calculating the Employer's withdrawal liability."  Interim Award 16.  But that

interpretation misconstrues ERISA Section 4211.  ERISA does not provide that withdrawal

liability is to be calculated based on the assumptions and methods "in effect" on the

Measurement Date, as the Arbitrator maintains.  ERISA instead provides that withdrawal

liability must be calculated based on the plan's unfunded vested benefits "as of" the

Measurement Date.  *See Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 418 (citing

ERISA Section 4211, 29 U.S.C. §§ 1391(b)(2)(A)(ii), (b)(2)(E)(i), (c)(2)(C)(i), (c)(3)(A), and (c)(4)(A)).

"In effect" and "as of" are not the same.  As the Fund explains, the 2013 Plan Year withdrawal liability interest rate assumption was in effect, i.e., in force,[11] on December 31, 2013, for the purpose of calculating withdrawal liability for any employer who withdrew anytime between January 1 and December 31, 2013.  Pls. Mem. 9 n.7.  The unfunded vested benefits amount (and the interest rate assumption necessary to calculate that amount) that was in effect on December 31, 2013, for withdrawals occurring during the 2013 Plan Year was, according to ERISA, required to be calculated *as of* December 31, 2012, meaning it incorporated data up through December 31, 2012.  Similarly, ERISA requires the unfunded vested benefits amount (and the interest rate assumption necessary to calculate that amount) for the 2014 Plan Year to be calculated *as of* December 31, 2013, meaning it must incorporate data up through December 31, 2013.  The unfunded vested benefits amount (and the interest rate assumption necessary to calculate that amount) applicable to the 2014 Plan Year would then go in effect starting on January 1, 2014.  Accordingly, "in effect" is the in force date, while "as of" is the measurement date.  The Arbitrator incorrectly conflated the two.  As explained above, the withdrawal liability interest rate assumption *in effect* on the Measurement Date is not applicable to the upcoming plan year unless the actuary affirmatively determines that the assumption, in combination with her other assumptions, is reasonable and her best estimate of anticipated experience under the plan *as of* the Measurement Date.[12]

---

[11]    Oxford English Dictionary, https://en.oxforddictionaries.com/definition/in_effect (last visited March 23, 2017).

[12]    The Arbitrator's holding that withdrawal liability assumptions continue to apply year after year until affirmatively changed by the actuary is also inconsistent with the professional standards governing actuaries. Because ERISA Section 4213 provides for a reasonableness standard, "it would make sense to judge the reasonableness of a method [or assumption]" and the timing of those decisions—"by reference to what the actuarial

### III.     There Is No Evidence that the Actuary Intended the 2013 Plan Year Withdrawal Liability Interest Rate Assumption to Apply to the 2014 Plan Year

Regardless of whether the Arbitrator's legal conclusion was correct that the 2013 Plan Year assumptions carried over by default to the 2014 Plan Year, Metz argues that the factual record supports a finding that the Fund (or at least its actuaries) initially intended the withdrawal liability interest rate assumption for the 2013 Plan Year to continue as an assumption for the 2014 Plan Year—an argument that Metz did not make during arbitration.  *See* Def. Opp. 15-16; Def. Reply 4-5.[13]  Metz points to: (1) a particular stipulation of fact, (2) Buck's Actuarial Report for the 2013 Plan Year, (3) the October 3, 2014, memorandum from Horizon to the Fund's trustees, and (4) the Schedule MB for the Fund's Form 5500 for the 2013 Plan Year.  The record does not support Metz's argument.

Metz contends that the Fund effectively conceded that the 2013 Plan Year assumptions remained operative rate for the 2014 Plan Year because the parties stipulated that the 2013 Plan Year interest rate assumption was still "in use" on December 31, 2013.  Def. Opp. 15; Def. Reply 3 n.1.  That was not, however, the fact to which the parties stipulated.  The parties stipulated that "Buck Consultants had used a 7.25 percent interest rate in 2013 to calculate

---

profession considers to be within the scope of professional acceptability in making an unfunded liability calculation."  *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 635 (1993).  Actuarial Standard of Practice 27 ("ASOP 27") provides, in relevant part, that "[t]he economic assumptions selected to measure pension obligations should reflect the actuary's knowledge base as of the measurement date."  Actuarial Standards Board, Doc. No. 145, *Actuarial Assumptions for Measuring Pension Obligations* § 3.14.3 (Sept. 2007 rev. ed., Updated for Deviation Language Effective May 1, 2011), *available at* http://www.actuarialstandardsboard.org/wp-content/uploads/2014/10/asop027_145.pdf (last visited March 12, 2017).  (There is a more recent version of ASOP 27, but the version cited applies to Metz's withdrawal as it is "effective for any actuarial valuation with a measurement date on or after March 15, 2008."  ASOP 27 § 1.4).  It seems clear, then, that as a matter of professional standards, an actuary must consider data relevant to the experiences of the plan up through the Measurement Date in making her assumptions.  The Court, however, makes no determination regarding whether, if an actuary has not yet selected her assumptions, she may in certain circumstances take into account events occurring after the Measurement Date in formulating her assumptions.

[13]      Metz also advanced this argument during oral argument in this case.  *See* Tr. 13:21-16:3, 24:25-26:4, 35: 21-37:11, 44:18-45:1, 45:17-20 (Dkt. 44).

unfunded vested benefit liabilities and withdrawal liability," Stip. ¶ 8, which says nothing about what the actuary intended with respect to assumptions applicable to 2014 withdrawals.

Metz argues that Buck's Actuarial Report for the 2013 Plan Year, issued in November 2013, shows that Buck signaled that it viewed the 7.25% rate as appropriate throughout 2013; specifically, Metz points to a table in the report that lists the withdrawal liability interest rate as 7.25% for January 1, 2012 and January 1, 2013.  Def. Opp. 16; Def. Reply 4-5 (citing Litvin Decl. Ex. G, at 15[14]).  Again, this evidence in no way indicates that Buck decided that the 7.25% rate would apply to 2014 (a period for which it was no longer the Fund's actuary).  Moreover, Buck's letter to the Fund's trustees transmitting the Report states unequivocally that "[t]he unfunded vested benefits reported for withdrawal liability purposes are measured as of December 31, 2012," Litvin Decl. Ex. G, at 1, and numerous portions of the Report are consistent with that statement, *see id.* at 6, 7, 11, 23.

Metz also claims that because Horizon stated in its October 3, 2014 memorandum that it had decided "to change" the withdrawal liability interest assumption, Horizon understood that it was changing—i.e., revising—the 2014 Plan Year interest rate assumption as opposed to establishing it for the first time.  Def. Mem. 16.  Apart from the word "change," there is nothing in the memorandum to suggest that Horizon believed it was changing interest rate assumptions that were already in place for 2014.  *See generally* Litvin Decl. Ex. F.  A more logical reading of the memorandum is that Horizon is explaining that it is adopting a withdrawal liability interest rate assumption for 2014 that is different from the rate that Buck had used in previous years.  Indeed, Horizon acknowledges in the memorandum that the Fund has "historically" used a

---

[14]     When citing to Exhibit G of the Litvin Declaration, the Court cites to the ECF pagination because the Exhibit includes more than one document, each with its own pagination.

7.25% interest rate assumption, *id.* at 2, and thus seems to indicate that it is breaking with that historic practice for 2014.

Finally, somehow, according to Metz, because Buck signed the Schedule MB for the Form 5500 for the 2013 Plan Year in November 2014, and because the Schedule MB provides that 7.25% is the interest rate assumption for withdrawal liability, Buck must have believed that the 7.25% rate applied to the 2014 Plan Year.  Def. Opp. 15; Def. Reply 4-5.  Once again, there is nothing in the Schedule MB that indicates the information therein applies to 2014, even if the Form 5500 was filed in 2014.  In contrast, the Form 5500 and Schedule MB are labeled "2013" at the top, and the heading states "for calendar plan year 2013."  Litvin Decl. Ex. H, at 4.[15]  It ultimately makes no sense to claim that the Schedule MB proves that, in November 2014, when Buck executed the Schedule MB, 7.25% was the interest rate assumption for the 2014 Plan Year because, by that time, Metz had already withdrawn from the Fund, and the Fund had already demanded that Metz pay withdrawal liability calculated in accordance with the lower PBGC interest rate assumption that Horizon had adopted.

In sum, based on ERISA, the Court rejects the Arbitrator's presumption that, absent an affirmative change by the Fund's actuaries, the 2013 Plan Year withdrawal liability interest rate assumption carried over to become the 2014 Plan Year assumption.  The Court also rejects Metz's factual argument that the Fund had, in fact, adopted 7.25% as the interest rate assumption for the 2014 Plan Year.  The remaining issue, therefore, is whether ERISA allows an actuary to select an interest rate assumption after the Measurement Date.

---

[15]     For clarity, when citing to Exhibit H of the Litvin Declaration, the Court cites to the ECF pagination.

IV.    **ERISA Does Not Require Actuaries to Make Withdrawal Liability Assumptions by the Measurement Date**

A.    **ERISA Section 4213 Does Not Require Actuaries to Select Assumptions by the Measurement Date**

Nothing in ERISA Section 4213, which requires that the assumptions in the aggregate represent the actuary's best estimate of anticipated experience under the plan, requires an actuary to select her assumptions by the Measurement Date. *See* 29 U.S.C. 1393(a)(1). ERISA Section 4213 is silent regarding the timing of an actuary's selection of her assumptions. As explained above, the requirement in ERISA Section 4211 that the actuary calculate unfunded vested benefits "as of the end of the last plan year" does not require the actuary to make her assumptions by the Measurement Date but only requires unfunded vested benefits to be *measured* as of that date. Indeed, Metz does not argue that Section 4213 itself requires actuaries to make their assumptions by the Measurement Date; Metz acknowledges that the statute is silent on the issue.

Considering just one hypothetical scenario illustrates the potential significant pitfalls of the Arbitrator's view of the law. If actuaries were required to select their withdrawal liability assumptions by the Measurement Date, in some instances at least, they would be unable to fulfill Section 4213's best estimate requirement. In order for an actuary to make her assumptions, she must first analyze data regarding the economy and financial markets, the fund's investments, and the plan's participants, among other things. To finalize her assumptions by the Measurement Date, she must do all of that analysis before she has a full year of data. If an economic or financial event took place between Christmas and New Year's Eve that would significantly affect the fund's future performance and its ability to meet its future liabilities, the actuary would not be able to take that data into account in formulating its assumptions because there would not be time to do so before the Measurement Date. If that were the case, the actuary's assumptions

18

in the aggregate might be neither reasonable nor the actuary's best estimate of anticipated

experience under the plan as of the Measurement Date, as required by Sections 4213 and 4211.

Moreover, it seems logical that even in a normal year (without any end-of-year financial

surprises), the information necessary to make thoughtful withdrawal liability assumptions may

not be entirely available before the end of the plan year, and an actuary needs time to collect,

review, and synthesize that information after it is all available. It is thus easy—and reasonable—

to imagine that an actuary may not be ready to state her assumptions by the Measurement Date.

If the Arbitrator's rule were correct, this would be problematic for actuaries. On the one hand,

ERISA Sections 4213 and 4211 would require them to make assumptions measured as of the last

day of the preceding plan year that are reasonable and their best estimate. On the other hand, the

Arbitrator's rule would require them to adopt assumptions by the Measurement Date. An

actuary would unlikely be able to satisfy both requirements as it would be difficult for an actuary

to make her best estimate without knowing all the relevant data as of the Measurement Date. In

short, the Arbitrator's rule is inconsistent with the actuary's obligations under ERISA Section

4213.

Metz suggests that allowing actuaries to select their assumptions at any point during the

plan year—instead of by the Measurement Date—invites abuse by funds and their actuaries.

According to Metz, the Arbitrator was rightfully concerned about bias because allowing

actuaries to select assumptions after the Measurement Date creates the opportunity for a plan's

trustees to wait and see if there will be a significant number of withdrawing employers and, if so,

then hire a new actuary who is willing to impose a more draconian interest rate assumption on

withdrawing employers. Def. Opp. 23-25; Tr. 56:17-57:6, 57:17-22.

But the posited bias problem is not a function of the date on which the actuary sets the

rate. *See* Tr. 57:7-16, 57:23-58:1. A fund's trustees, knowing that the fund is in a difficult

financial situation, may at any time remove one actuary in favor of another actuary who appears

to be more malleable.  Indeed, in this case, Horizon was hired in the fall of 2013 and could have

adopted the PBGC rate before the Measurement Date.  If Horizon had done so, Metz would not

be able to argue, as it does now, that the rate does not apply to it because the rate would have

been adopted before December 31.  Yet, Metz's concern about bias would remain.  Under

ERISA, a withdrawing employer's protection is (1) the professionalism of the actuary, *see*

*Concrete Pipe & Prod. of California, Inc.*, 508 U.S. at 632 (1993) ("For a variety of reasons, this

actuary is not, like the trustees, vulnerable to suggestions of bias or its appearance.  Although

plan sponsors employ them, actuaries are trained professionals subject to regulatory standards."),

and (2) the actuary's statutory obligation to set the withdrawal liability based on reasonable

assumptions that reflect the actuary's best estimate.  An actuary who is simply bowing to

pressure from a fund is violating her ERISA mandate, regardless of the date on which her

interest rate assumptions are finalized.[16]  Providing additional protections to employers, if

warranted, is best left to Congress.

### B. ERISA Section 4214 Only Applies to Plan Rules and Amendments, Not Actuarial Assumptions

Finally, Metz argues that Section 4214, which prohibits the retroactive application of plan

rules or amendments to withdrawing employers, also applies to interest rate assumptions.  *See*

Def. Opp. 17-20.  ERISA Section 4214 provides in full:

(a) No plan rule or amendment adopted after January 31, 1981, under [ERISA Sections 4209 and 4211(c)] of this title may be applied without the employer's consent with respect to liability for a withdrawal or partial withdrawal which occurred before the date on which the rule or amendment was adopted.

---

[16]     Whether Horizon's selection of the PBGC rate, in combination with its other assumptions, was reasonable and its best estimate is not before this Court.  If Metz chooses to arbitrate the issue, a factual record can be developed that fleshes out Horizon's thought processes.  If Metz has evidence to support its suggestion that Horizon bowed to pressure from the Fund, the Court is confident an arbitrator will be able to evaluate that evidence appropriately.

> (b) All plan rules and amendments authorized under this part shall operate and be
> applied uniformly with respect to each employer, except that special provisions may
> be made to take into account the creditworthiness of an employer. The plan sponsor
> shall give notice to all employers who have an obligation to contribute under the plan
> and to all employee organizations representing employees covered under the plan of
> any plan rules or amendments adopted pursuant to this section.

29 U.S.C. § 1394.  Metz claims that because Section 4214(a) references Section 4211(c),[17] which

addresses "Amendment of multiemployer plan for determination respecting amount of unfunded

vested benefits allocable to employer withdrawn from plan; factors determining computation of

amount," 29 U.S.C. § 1391(c), and because the interest rate assumption is a critical factor in the

withdrawal liability calculations, withdrawal liability assumptions "logically fit" as a plan rule or

amendment under Section 4214.  Def. Opp. 17-18.  In addition, Metz contends that Section

4214(b) applies to interest rate assumptions because it incorporates Section 4213 when it states

that it applies to "[a]ll plan rules and amendment authorized under this part."  *Id.* at 19.  Metz

points to Section 4214's legislative history[18] as support, claiming that Congress intended it to be

expansive and to bar the retroactive application not only of plan rules relating to withdrawal

liability but also interest rate assumptions, which are "naturally include[d]" therein.  *Id.* at 18.

    None of Metz's arguments is persuasive.  Although Section 4214 may reference other

ERISA provisions relating to the calculation of withdrawal liability, nowhere in Section 4214 or

---

[17]    Metz admits that Section 4209 is irrelevant because it addresses the role of the "*de minimis*" rule in calculating withdrawal liability, which does not apply here.

[18]    Metz specifically quotes the following:

> There are several situations where plans, in the application of their own rules, either initially or by
> amendment, are permitted a wide degree of latitude in allocating and calculating withdrawal liability.  In
> order to protect an employer from certain retroactive changes in a plan's rules, the bill prohibits the
> retroactive application of a plan rule or amendment relating to withdrawal liability from applying to a
> withdrawal occurring before its date of adoption, unless the employer consents to its earlier application.

H.R. Rep. No. 96-869, pt. 2, at 30 (1980).

the legislative history does it suggest that Section 4214 applies to actuarial assumptions. The statute and the legislative history exclusively use the terms "plan rule" or "amendment," and there is no language suggesting that those terms should be interpreted broadly to include actuarial assumptions. The statute does not define "rule" or "amendment," but the Court finds the Fund's explanation that a rule or amendment is something voted on by the trustees, s*ee* Tr. 53:11-19, is logical. Metz acknowledged in its opening brief to the Arbitrator that Horizon's adoption of the PBGC rate was not a *per se* plan rule or amendment, Sabatini Decl. Ex. B, at 10, and the parties do not dispute that the trustees did not vote to adopt Horizon's assumptions.

Metz argues that plan rules need not be exclusively plan document provisions, and because a fund's trustees are not wholly removed from the process of selecting actuarial assumptions—namely, they have a fiduciary duty to ensure that actuarial assumptions are sound—the selection of an actuarial assumption is as much a "plan rule" as any other trustee action. Def. Reply. 6; Tr. 46:17-47:16. This approach, however, would effectively turn any trustee action into a plan rule or amendment. Metz advocates that even if the selection of the interest rate assumption is not actually a plan rule or amendment, Section 4214 should apply because Congress was concerned generally "about changes that take place after a withdrawal that could impact a[n] employer's withdrawal liability." Tr. 51: 6-11. But, there is nothing in the legislative history to suggest that Section 4214 should be generalized in this way. Congress's concern, as reflected in the statute's and the legislative history's exclusive reference to plan rules and amendments, was about retroactive plan rules and amendments having an impact on withdrawal liability. Accordingly, the Court is not persuaded that Section 4214's prohibition on retroactive application of plan rules or amendments has any applicability to this dispute.[19]

---

[19]     The Court's analysis would be different if a plan rule or amendment provided for a specific interest rate assumption to be used. Because the trustees would have voted on that assumption as part of the plan, Section 4214

Moreover, the distinction between Section 4214—which explicitly prohibits the retroactive application of plan rules or amendments—and Section 4213—which is silent as to the timing of the actuary's selection of withdrawal liability assumptions—further emphasizes that Section 4213 does not prohibit the retroactive application of actuarial assumptions within a given plan year, so long as they are made as of the appropriate Measurement Date.  If Congress had wanted to preclude the retroactive application of assumptions within a given plan year, it could have done so explicitly, as it did in Section 4214 for plan rules and amendments.

### C.   ERISA Section 101(1) Is Consistent with the Interpretation that ERISA Does Not Require Actuaries to Select Assumptions by the Measurement Date

The Court is sympathetic to employers' concern, as described above, that if an actuary can select her assumptions at any point during a plan year and apply them retroactively to withdrawing employers, those employers may be unpleasantly surprised that their withdrawal liability is significantly more than expected.  But ERISA Section 101(l) shows that this is already the case.  ERISA Section 101(1) governs employer requests for withdrawal liability estimates in a multiemployer pension plan.  The withdrawal liability estimate is measured as "if such employer withdrew on the last day of the plan year preceding the date of the request."  29 U.S.C. § 1021(l)(1)(A).  Thus, under the Plan at issue here, on June 1, 2014, an employer's estimate of withdrawal liability would be calculated as if the employer withdrew on December 31, 2013, which, under ERISA Section 4211, would be calculated as of December 31, 2012—the last day of the plan year preceding the plan year in which the hypothetical withdrawal occurred. Adopting the Arbitrator's rule that actuaries must choose assumptions by the Measurement Date would not improve employers' ability to gauge their expectations regarding withdrawal liability

---

would presumably apply.  *See, e.g.*, *Allen v. W. Point-Pepperell, Inc.*, 908 F. Supp. 1209, 1213, 1222-23 (S.D.N.Y. 1995) (although Section 4214 did not apply because it was a single-employer plan, the terms of this plan dictated a specific numeric interest rate assumption).

assessments; the estimates provided to them will always be lagging as they are statutorily required to be based on a prior year.

ERISA Section 101(l) also suggests that Congress understood that the assumptions necessary to calculate withdrawal liability may not be ready by the first day of the plan year, in contrast with the Arbitrator's holding.  If the Arbitrator were correct that ERISA required actuaries to select their assumptions by the Measurement Date, there would have been no need for Congress to direct that withdrawal liability estimates be calculated as if the withdrawal occurred in the previous plan year.  Likewise, Section 101(l) would not have needed to provide a 180-day window for a plan to give an estimate of withdrawal liability to an employer.  *See* 29 U.S.C. § 102(l)(2)(A).

Accordingly, Section 101(l) only makes sense if there is no requirement that actuaries select all of their assumptions by the Measurement Date. [20]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to vacate the arbitration award is GRANTED, and Defendant's motion to confirm the arbitration award is DENIED.  The

---

[20]     Metz and the Arbitrator point to PBGC Opinion Letters Nos. 90-2 (Apr. 20, 1990) and 94-5 (Sept. 27, 1994) and *Roofers Local No. 30 Combined Pension Fund v. D.A. Nolt, Inc.*, 719 F. Supp. 2d 530 (E.D. Pa. 2010), *aff'd,* 444 F. App'x 571 (3d Cir. 2011), for the proposition that an actuary cannot retroactively change a withdrawal liability interest rate assumption after it has been selected. Def. Opp. 14; Interim Award 12-14. Metz and the Arbitrator are correct, but that proposition is not instructive here.

Those sources go no further than to provide that withdrawal liability calculations made in a prior plan year may not be retroactively revised in light of an error discovered after withdrawal liability has been calculated for a withdrawing employer.  *See Roofers Local No. 30 Combined Pension Fund*, 719 F. Supp. 2d at 546-51 (confirming arbitration award and holding that a fund's attempt to retroactively increase unfunded vested benefits for prior plan years due to a later discovered mathematical error was not permitted under ERISA); PBGC Opinion Letter No. 90-2 ("If the trustees discover an error in the calculation of the plan's unfunded vested benefits for a prior plan year, the valuation for that prior year may not be changed retroactively."); PBGC Opinion Letter No. 94-5 ("In Opinion Letter 90-2, we were referring to errors relating to mistaken or varying data or actuarial assmptions, rather than errors that are purely mathematical or computational in nature.").  But, that is not the scenario before this Court.  At issue here is whether an actuary must choose her withdrawal liability assumptions by the Measurement Date or whether she may choose them after the Measurement Date.  The sources cited by Metz and the Arbitrator do not touch on this question.

arbitration award is thus VACATED.  The Court denies Metz's request to remand the case to

arbitration because ERISA does not provide it with the authority to do so given that the Court

has vacated an unambiguous award.  *See* 29 U.S.C. § 1401(b); *Hyle v. Doctor's Assocs., Inc.*,

198 F.3d 368, 370 (2d Cir. 1999) (holding that "once arbitrators have finally decided the

submitted issues, they are, in common-law parlance, 'functus officio,' meaning that their

authority over those questions is ended" (citation omitted) and holding that a "district court can

remand an award to the arbitrator for clarification when an award is ambiguous").

  The Clerk of Court is respectfully directed to close docket entries 18 and 31 and to

terminate the case.


**SO ORDERED.**

Date: **March 27, 2017**       **VALERIE CAPRONI**
    **New York, New York**      **United States District Judge**